UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | | |
|---|---|---|
| TONIE M. MARLOW, | ) | |
| | ) | |
| Plaintiff, | ) | CASE NO. C06-520-RSL-MJB |
| | ) | |
| v. | ) | REPORT AND |
| | ) | RECOMMENDATION |
| JO ANNE B. BARNHART, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

Plaintiff Tonie Marlow appeals to the District Court from a final decision of the Commissioner of the Social Security Administration (the "Commissioner") denying her application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act. For the reasons set forth below, it is recommended that the Commissioner's decision be REVERSED and REMANDED for further proceedings.

## I.  PROCEDURAL HISTORY

Plaintiff applied for Disability Insurance Benefits ("DIB") on December 10, 2002 (Tr. 55-57), alleging disability since December 24, 2001, and identifying her impairments as severe chronic pain, fibromyalgia, chronic myofascial pain syndrome, bursitis in hips, and migraine headaches (Tr. 68).  The Social Security Administration denied Plaintiff's application initially and upon reconsideration.  (Tr. 29, 31.)  A hearing was held before Administrative Law Judge ("ALJ") Verrell Dethloff on June 20, 2005.  (Tr. 353.)  Plaintiff was represented by counsel and

REPORT AND RECOMMENDATION
PAGE - 1

1   testified at the hearing.  (Tr. 353-375.)  The ALJ issued an unfavorable decision on January 19,

2   2006, finding that Plaintiff's medically determinable impairments do not prevent her from

3   performing her past relevant work, and thus, she was not under a disability at any time through

4   the date of the decision.  (Tr. 27.)  On March 16, 2006, the Appeals Council denied Plaintiff's

5   request for review, making the ALJ's decision the final decision of the Commissioner.  (Tr. 6.)

6   Plaintiff timely filed her appeal with this Court.

7                                II.  THE PARTIES' POSITIONS

8        Plaintiff requests that the Court vacate the Commissioner's decision and order the

9   Commissioner to find Plaintiff disabled.  (Dkt. 15.)  Alternatively, Plaintiff requests that the

10  Court reverse the Commissioner's decision and remand for further administrative proceedings.

11  (*Id.*)  Plaintiff argues that the ALJ erred by failing to: (1) provide a reason for rejecting the

12  opinions of three treating doctors regarding the severity of Plaintiff's mental impairments; (2)

13  consider Plaintiff's hip bursitis, insomnia, and migraine headaches, and find Plaintiff's carpal

14  tunnel syndrome severe; (3) provide clear and convincing evidence for finding the Plaintiff not

15  credible regarding her degree of pain and the nature and severity of her functional limitations;

16  and (4) include all exertional and non-exertional limitations in the residual functional capacity

17  assessment.  (*Id.*)  Defendant responds that the Commissioner's decision should be affirmed

18  because it is supported by substantial evidence.  (Dkt. 17.)

19                                III.  STANDARD OF REVIEW

20       The court may set aside the Commissioner's denial of social security disability benefits

21  when the ALJ's findings are based on legal error or not supported by substantial evidence in the

22  record as a whole.  *Penny v. Sullivan*, 2 F.3d 953, 956 (9th Cir. 1993).  Substantial evidence is

23  defined as more than a mere scintilla but less than a preponderance; it is such relevant evidence

24  as a reasonable mind might accept as adequate to support a conclusion.  *Magallanes v. Bowen*,

25

26  REPORT AND RECOMMENDATION
    PAGE - 2

1  881 F.2d 747, 750 (9th Cir. 1989).  The ALJ is responsible for determining credibility, resolving

2  conflicts in medical testimony, and for resolving ambiguities.  *Andrews v. Shalala*, 53 F.3d 1035,

3  1039 (9th Cir. 1995).  Where the evidence is susceptible to more than one rational interpretation,

4  it is the Commissioner's conclusion which must be upheld.  *Sample v. Schweiker*, 694 F.2d 639,

5  642 (9th Cir. 1982).

6  ## IV.  EVALUATING DISABILITY

7  The claimant bears the burden of proving that he is disabled.  *Meanel v. Apfel*, 172 F.3d

8  1111, 1113 (9th Cir. 1999).  Disability is defined as the inability to engage in any substantial

9  gainful activity by reason of any medically determinable physical or mental impairment, which

10  can be expected to result in death, or which has lasted or can be expected to last for a continuous

11  period of not less than twelve months.  42 U.S.C. § 423 (d)(1)(A).

12  The Social Security regulations set out a five-step sequential evaluation process for

13  determining whether claimant is disabled within the meaning of the Social Security Act.  *See* 20

14  C.F.R. § 416.920.  At step one, the claimant must establish that he or she is not engaging in any

15  substantial gainful activity.  20 C.F.R. §§ 404.1520(b), 416.920(b).  At step two, the claimant

16  must establish that he or she has one or more medically severe impairments or combination of

17  impairments.  If the claimant does not have a "severe" impairment, he or she is not disabled.  *Id.*

18  at § (c).  At step three, the Commissioner will determine whether the claimant's impairment

19  meets or equals any of the listed impairments described in the regulations.  A claimant who meets

20  one of the listings is disabled.  *See Id.* at § (d).

21  At step four, if the claimant's impairment neither meets nor equals one of the impairments

22  listed in the regulations, the Commissioner evaluates the claimant's residual functional capacity

23  and the physical and mental demands of the claimant's past relevant work.  *Id.* at § (e).  If the

24  claimant is not able to perform his or her past relevant work, the burden shifts to the

25

26  REPORT AND RECOMMENDATION
   PAGE - 3

1  Commissioner at step five to show that the claimant can perform some other work that exists in

2  significant numbers in the national economy, taking into consideration the claimant's residual

3  functional capacity, age, education, and work experience. *Id.* at § (f); *Tackett v. Apfel*, 180 F.3d

4  1094, 1100 (9th Cir. 1999). If the Commissioner finds the claimant is unable to perform other

5  work, then the claimant is found disabled.

## V.  SUMMARY OF THE RECORD EVIDENCE

7        Plaintiff was born on January 29, 1955 and was 50 years old at the time of the hearing

8  before the ALJ. (Tr. 55, 353.) She is a high school graduate (Tr. 74) and has worked previously

9  as a custom framer (Tr. 69). She has been diagnosed with fibromyalgia (Tr. 295),

10  hypothyroidism (Tr. 312), major depression, anxiety, and migraines, (Tr. 250, 333), panic

11  disorder (Tr. 250), and bursitis in hips (Tr. 144). In her disability report, Plaintiff indicated that

12  her condition limits her ability to work because she can stand and walk for only a limited time

13  and because she cannot be relied upon to report to work regularly due to the unpredictability of

14  the pain. (Tr. 68.) Other evidence relevant to Plaintiff's claims is incorporated into the

15  discussion below.

## VI.  THE ALJ'S DECISION

17        The ALJ found that Plaintiff had not engaged in substantial gainful activity since the

18  alleged onset of disability. (Tr. 27.) The ALJ also found that Plaintiff's fibromyalgia, diabetes,

19  irritable bowel syndrome, obesity, hypothyroidism, and sleep apnea are severe impairments, but

20  that they do not meet or medically equal one of the listed impairments. (*Id.*) The ALJ found that

21  Plaintiff's allegations regarding her limitations are not totally credible. (*Id.*) The ALJ also found

22  that Plaintiff has the residual functional capacity to lift twenty pounds occasionally and ten

23  pounds frequently, and that she could sit, stand, or walk for six hours in an eight hour day. (*Id.*)

24  Finally, the ALJ found that Plaintiff's severe impairments do not prevent her from performing her

25

26  REPORT AND RECOMMENDATION
PAGE - 4

1  past relevant work.  (*Id.*)  Accordingly, the ALJ concluded that Plaintiff was not disabled at any

2  time through the date of the decision.  (*Id.*)

3                                    VII.  DISCUSSION

4  A.      MENTAL IMPAIRMENTS

5          Plaintiff argues that the ALJ erred in (1) determining that Plaintiff has no severe mental

6  impairments, rejecting without reason the opinions of three treating doctors who found GAFs

7  between 51-60, relying instead upon a State agency psychologist's Psychiatric Review Technique

8  (PRT), and an evaluating doctor's opinion who found a GAF of 65, and (2) failing to prepare his

9  own PRT.  The Commissioner opposes these arguments.

10         (1) Physicians' Opinions

11         Generally, more weight should be given to the opinion of a treating source than to the

12  opinions of doctors who did not treat the claimant.  *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir.

13  1996) (citing *Winans v. Bowen*, 853 F.2d 643, 647 (9th Cir. 1987)).  The opinion of an examining

14  doctor, even if contradicted by another doctor, can only be rejected for specific and legitimate

15  reasons that are supported by substantial evidence in the record.  *Lester*, 81 F.3d at 830-31

16  (citing *Murray v. Heckler*, 722 F.2d 499, 502 (9th Cir. 1983)).  An impairment is not severe when

17  medical evidence establishes only a slight abnormality or combination of slight abnormalities that

18  have no more than a minimal effect on an individual's ability to work.  *Yuckert v. Bowen*, 841

19  F.2d 303, 306 (9th Cir. 1988).

20         The ALJ found that Plaintiff does not have a severe mental impairment because her

21  depression and anxiety had been treated by medication and therapy, resulting in improvement, as

22  noted by Dr. Catherine Strong.  (Tr. 24.)  The ALJ also found that no medical provider has

23  suggested that Plaintiff has a significant limitation related to her depression and anxiety.  (*Id.*)

24  The ALJ noted that Plaintiff is able to travel, associate with friends, and paint, suggesting few

25

26  REPORT AND RECOMMENDATION
   PAGE - 5

1  limitations in social functioning, concentration, persistence, or pace. (*Id.*)  The ALJ also noted

2  that Plaintiff's limitations in activities of daily living are related to pain rather than mental

3  impairments, and that she has had no episode of decompensation of extended duration. (*Id.*)

4  The ALJ adopted the findings of State agency psychologist, Dr. William Lysak, which he found

5  to be strongly supported by examining psychiatrist, Dr. David Sandvik. (*Id.*)

6  Plaintiff was examined by Dr. David Sandvik in April 2003, and treated by Dr. Strong

7  from December 2001 to May 2002, by Dr. David Koch, from July 2003 to August 2004, and by

8  Dr. Susan Hakeman, from September 2004 to February 2005. (Tr. 170, 143, 234, 333.) Dr.

9  Sandvik assessed Plaintiff's GAF as 65, while each of the three treating doctors assessed her as

10 between 51 and 60. (Tr. 173, 143, 247, 333.) Dr. Strong indicated that by the time she stopped

11 seeing Plaintiff in May 2002, she was significantly less depressed and less anxious. (Tr. 168.)

12 However, in the month before, Dr. Strong assessed Plaintiff's GAF as between 51 and 60. (Tr.

13 143.) Thus, while Plaintiff improved, her functioning appears to have remained limited toward

14 the end of her treatment.  Later GAF assessments by subsequent treating psychiatrists also

15 indicated limitation.

16 Dr. Koch assessed Plaintiff as "unable to work due to fibromyalgia," with a GAF of 55 in

17 July 2003 (Tr. 247[1]), and Dr. Hakeman assessed her GAF as 60 in September 2004 (Tr. 338).

18 However, Dr. Koch's assessment of inability to work was specifically based upon fibromyalgia,

19 rather than mental impairment, and in August 2003, he assessed Plaintiff as "currently doing well

20 with respect to her major depression, though continues with her anxiety disorder symptoms and

21 intermittent panic attacks." (Tr. 248.)  It is not clear from the record whether Dr. Hakeman's

22

23

24       [1]Dr. Koch's treatment notes were incorrectly paginated in the administrative record. The
correct sequence appears to be as follows: 234, 249, 250, 247, 248, 246, 245, 244, 243, 242,
241, 240, 239, 238, 237, 236, 235.

25

26 REPORT AND RECOMMENDATION
PAGE - 6

1   and Dr. Strong's GAF assessments were based upon Plaintiff's mental or physical condition.  Dr.

2   Hakeman diagnosed Plaintiff with major depression in full to partial remission and anxiety.  (Tr.

3   338.)  Dr. Strong noted that Plaintiff's anxiety is due largely to pain, and that her depression is

4   due to pain and fatigue.  (Tr. 168.)  She also noted that Plaintiff's concentration sometimes

5   varies, largely due to distracting pain.  (Tr. 168.)

6          I find that the record indicates that Plaintiff's limitations, as assessed by her treating

7   mental health providers, were based at least in part on physical rather than mental conditions.

8   However, I also find that the record indicates that Plaintiff's mental and physical conditions may

9   be interrelated, but the record is not fully developed on this point, nor with regard to whether

10   Plaintiff has significant limitation based on mental impairment.

11          To the extent that the treating doctors' assessments were based upon mental conditions

12   or interrelated physical and mental conditions, I find that the ALJ did not provided specific and

13   legitimate reasons in the record for rejecting the opinions of the treating doctors in favor of the

14   State agency psychologist.

15          Additionally, I find that it is unclear how Plaintiff's travel, socializing, and painting

16   supports the rejection of her treating doctors, whose GAF assessments were made with

17   awareness of these activities.  Nor is it clear how these activities indicate few limitations in social

18   functioning, concentration, persistence, or pace.  Plaintiff paints approximately two to three

19   hours per week.  (Tr. 99.)  She has been encouraged by her treating psychologist to increase her

20   social activities as part of her treatment plan (Tr. 143); however, she cannot be with groups of

21   people longer than one and a half hours and often must leave in the middle of dinner (Tr. 102).

22   Plaintiff's travel is discussed *supra*, under paragraph C.

23   //

24   //

25

26   REPORT AND RECOMMENDATION
     PAGE - 7

1

2      (2)  <u>Psychiatric Review Technique</u>

3      The severity of mental impairments must be evaluated using a special technique at each

4 level in the administrative review process.  20 C.F.R. §§ 404.1520a(a), 416.920a(a).  The written

5 decision issued by the ALJ must incorporate the pertinent findings and conclusions based on the

6 technique and show the significant history and functional limitations that were considered in

7 reaching a conclusion about the severity of the impairment.  20 C.F.R. § 404.1520a(e)(2).  A

8 Psychiatric Review Technique Form (PRTF) must be completed at the initial, reconsideration,

9 ALJ hearing, and Appeals Council levels.  20 C.F.R.§§ 404.1620a(d), 416.920a(d).  Where there

10 is a colorable claim of mental impairment, the PRTF must be completed and appended to the

11 decision, and the failure to do so requires remand.  *Gutierrez v. Apfel*, 199 F.3d 1048, 1051 ( 9th

12 Cir. 2000) (citing 20 C.F.R. § 404.1520a).  A PRTF completed by other than the ALJ, dated

13 more than a year before the hearing, and largely incomplete do not cure the violation.  *Id.*

14      A PRTF was completed on May 1, 2003 by State agency psychologist William Lysak.

15 (Tr. 174.)  The hearing before the ALJ occurred on June 20, 2005.  (Tr.353.)  Two and a half

16 years had elapsed between the completion of the PRTF and the hearing.  Subsequent to the

17 completion of the PRTF, Plaintiff was treated by Dr. Koch from July 2003 to August 2004, and

18 by Dr. Hakeman from September 2004 to February 2005.  (Tr. 234, 333.)  Dr. Koch diagnosed

19 Plaintiff with recurrent major depression, panic disorder, and generalized anxiety disorder.  (Tr.

20 250.)  Dr. Hakeman diagnosed Plaintiff with anxiety and major depression in full to partial

21 remission.  (Tr. 333-38.)  Their opinions were not contemplated in the PRTF.  Prior to

22 completion of the PRTF, Dr. Strong had diagnosed Plaintiff with depression and anxiety (Tr.

23 143).  Based on the diagnoses of depression and anxiety by three treating doctors, a colorable

24 claim of mental impairment exists.  Accordingly, I find that a PRTF must be completed at the

25

26  REPORT AND RECOMMENDATION
PAGE - 8

1   ALJ level, and that the ALJ's decision must incorporate the pertinent findings and conclusions

2   based on the technique and show the significant history and functional limitations that were

3   considered in reaching a conclusion regarding the severity of Plaintiff's mental impairment.

4   B.   PHYSICAL IMPAIRMENTS

5          Plaintiff argues that the ALJ erred by failing to (1) address Plaintiff's bursitis, as distinct

6   from her fibromyalgia, (2) consider the combination of impairments in light of the bursitis, (3)

7   consider Plaintiff's sleep disorder related to mental problems distinct from sleep apnea, (4) find

8   Plaintiff's carpal tunnel syndrome severe, and (5) address Plaintiff's migraine headaches.  The

9   Commissioner rejects all of these propositions.

10         The ALJ evaluates a claimant's symptoms, including pain, considering all available

11  evidence and statements.  20 C.F.R. §§ 404.1529, 416.929.  A claimant's impairment, or

12  combination of impairments, is not severe if it does not significantly limit the claimant's physical

13  or mental ability to do basic work activities.  20 C.F.R. §§ 404.1520(c), 404.1521(a).  An

14  impairment or combination of impairments can be found "not severe" only if the evidence

15  establishes a slight abnormality that has "no more than a minimal effect on an individual's ability

16  to work."  *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996) (internal citations omitted).

17  The ALJ must consider the combined effect of all impairments on the claimant's ability to

18  function, without regard to whether each alone was sufficiently severe.  (*Id.*)

19         First, the ALJ did not address Plaintiff's alleged bursitis, and Defendant argues that

20  Plaintiff has not shown how hip pain, separate from fibromyalgia, causes significant limitations.

21  This is in error when one reviews the record.  In her Disability Report, Plaintiff listed chronic

22  pain from fibromyalgia, chronic myofascial pain syndrome, bursitis in hips, and migraine

23  headaches as the conditions that limit her ability to work.  (Tr. 68.)  Dr. Philip Zeidner noted that

24  Dr. Sakehara had done EMG studies and diagnosed "fibromyalgia, chronic myofascial pain, and

25

26  REPORT AND RECOMMENDATION
    PAGE - 9

bursitis in her hips." (Tr. 144.)  Dr. Marian Johnston assessed Plaintiff with SI joint pain and

dysfunction and, separately, with fibromyalgia.  (Tr. 317-322, 324-326.)  Plaintiff testified as to

physical and mental limitations due to pain in her hips.  (Tr. 365.)  I find that the record supports

a finding of hip bursitis as distinct from fibromyalgia.  I further find that the record has not been

fully developed as to whether the bursitis causes severe impairment independent of the

fibromyalgia.

Second, the record also demonstrates that the ALJ did not address Plaintiff's alleged

sleep disorder related to mental problems, as distinct from her sleep apnea.  Plaintiff was

diagnosed with sleep apnea by Dr. William Waltner in July 2001.  (Tr. 155.)  She was

successfully treated for this ailment by October 2001.  (Tr. 154.)  Subsequently, Dr. Lysak noted

a sleep disturbance in connection with Plaintiff's depressive syndrome, an affective disorder.  (Tr.

177.)  Dr. Strong, who began treating Plaintiff in December 2001, also noted that Plaintiff had

frequently disrupted sleep, but did not indicate the source of the disruption.  (Tr. 168.)  Plaintiff

reported to Dr. Zeidner in April 2002 that pain interrupts her sleep approximately twice nightly.

(Tr. 144.)  Plaintiff reported to Dr. Koch in August 2002 that despite resolution of the sleep

apnea, she has insomnia, which she attributed to pain or worries.  (Tr. 247-248.)  Dr. Koch

treated Plaintiff for her "sleep disorder" in September 2003, and he noted that her depression

may not be the cause of her terminal insomnia.  (Tr. 246.)  Accordingly, I find that the record

establishes that Plaintiff has insomnia unrelated to sleep apnea, although it is unclear from the

record whether the insomnia is related to mental problems.

Third, the ALJ found that nothing in the record establishes a diagnosis of carpal tunnel

syndrome (CTS).  (Tr. 24.)  Plaintiff had surgery for CTS in 2000 (Tr. 250), subsequently

experiencing substantial relief from pain and numbness (Tr. 145).  In 2002, Dr. Zeidner, upon

physical examination of Plaintiff's upper extremities, noted decreased sensation bilaterally at

REPORT AND RECOMMENDATION
PAGE - 10

1  approximately the C5 level, and diagnosed a probable C5 radiculopathy.  (Tr. 146-147.)  In

2  response to the ALJ's question about ongoing CTS problems post-surgery, Plaintiff testified that

3  she currently experiences pain in her right arm and right hand.  (Tr. 369.)  Plaintiff is right-

4  handed.  (*Id.*)  Her handwriting is deteriorating, and pain can cause problems with dressing,

5  grooming, and typing.  (*Id.*)  She must take breaks from typing after seven to ten minutes.  (*Id.*)

6  I find that the ALJ has failed to state specific reasons for his finding that no basis exists for a

7  diagnosis of CTS.

8         Fourth, the ALJ did not address Plaintiff's migraine headaches.  In her Disability Report,

9  Plaintiff listed migraine headaches as among the conditions that limit her ability to work.  (Tr.

10  68.)  She was diagnosed with and treated for migraine headaches by Drs. Koch, Hakeman, and

11  Zeidner.  (Tr. 249, 250, 338, 194, 199.)  In September 2004, she reported having migraine

12  headaches three times per month.  (Tr. 337.)  At her hearing, she testified that sitting too long,

13  typing, or talking on the telephone gives her headaches.  (Tr. 364.)  I find that the record

14  indicates that Plaintiff suffers from migraine headaches, and that the ALJ has failed to state any

15  consideration of this consider this.

16         In summary, I find that the record supports that Plaintiff's hip bursitis, sleep disorder

17  apart from sleep apnea, CTS, and migraine headaches may significantly limit her ability to do

18  basic work activities, and that as consequence the ALJ was in error..

19  C.    <u>CREDIBILITY</u>

20         Plaintiff argues that the ALJ erred in finding Plaintiff is not credible regarding the degree

21  of pain she suffers and the nature and severity of the limitations her pain imposes on her

22  functioning.

23         The ALJ is responsible for determining credibility, resolving conflicts in medical

24  testimony, and for resolving ambiguities.  *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir.

25

26  REPORT AND RECOMMENDATION
   PAGE - 11

1    1995).  Where the evidence is susceptible to more than one rational interpretation, it is the

2    Commissioner's conclusion which must be upheld.  *Sample v. Schweiker*, 694 F.2d 639, 642 (9th

3    Cir. 1982).  The ALJ can reject a plaintiff's symptom testimony only if he makes specific

4    findings, stating clear and convincing reasons for doing so.  *Dodrill v. Shalala*, 12 F.3d 915, 918

5    (9th Cir. 1993).  In weighing a claimant's credibility, the ALJ may consider her reputation for

6    truthfulness, inconsistencies either in her testimony or between her testimony and her conduct,

7    unexplained or inadequately explained failure to seek treatment or to follow a prescribed course

8    of treatment, her daily activities, work record, and testimony from physicians and third parties

9    concerning the nature, severity, and effect of the symptoms of which she complains.  *Smolen v.*

10   *Chater*, 80 F.3d 1273, 1284 (9th Cir. 1996).  An ALJ notes any daily activities which "may be

11   seen as inconsistent with the presence of a condition which would preclude all work activity."

12   *Curry v. Sullivan*, 925 F.2d 1127, 1130 (9th Cir. 1990). "Disability claimants should not be

13   penalized for attempting to lead normal lives in the face of their limitations." *Reddick v. Chater*,

14   157 F.3d 715, 722 (9th Cir. 1998).   A "disability claimant need not 'vegetate in a dark room' in

15   order to be deemed eligible for benefits." *Id.* (citing *Cooper v. Bowen*, 815 F.2d 557, 561 (9th

16   Cir. 1987).

17          The ALJ found Plaintiff not credible, listing a number of factors in support of this

18   conclusion.  (Tr. 25-26.)  First, the ALJ noted that Plaintiff's complaints are long standing, with

19   symptoms dating back to at least 1998, and that she was able to continue working until the end

20   of 2001, when she was hospitalized for diverticulitis and her business bordered on bankruptcy.

21   (Tr. 25.)  He found that there was no objective change in her impairments, and that her physician

22   noted in September 2004 that she was much better than three years ago.  (*Id.*)

23          The record demonstrates that while many of Plaintiff's symptoms date back to 1998,

24   beginning with specialists in April 2002, she was consistent in her reporting of the gradual impact

25
     REPORT AND RECOMMENDATION
26   PAGE - 12

1   and need for pain management.  (Tr. 144.)  She was treated for pain for approximately for two

2   years by Dr. Zeidner, followed by Dr. Johnston for approximately another year.  (Tr. 144-147,

3   194-233, 317-332.)  At the onset of her treatment with Dr. Zeidner, Plaintiff reported that she

4   had begun to have pain approximately five to six years ago, and that the pain had worsened since

5   then.  (Tr. 144.)  In the Daily Activities Questionnaire - Other Person, a friend reported that

6   Plaintiff's pain has been worsening slowly and steadily over time since the mid 1990's.  (Tr. 91.)

7   Plaintiff reported to Dr. Dickinson in January 2002 that while her depression is lifelong, it was

8   increasing, with the exacerbation dating back to November or December.  (Tr. 277.)

9       Additionally, Plaintiff reported on her Pain Questionnaire that her pain has gotten worse

10  over time, with new areas of pain occurring.  (Tr. 101.)  She stated on her Disability Report that

11  the pain started in 1997, and became severe in May 2001, at which time she began to work fewer

12  hours.  (Tr. 68.)  At the end of the year she was hospitalized with diverticulitis, after which her

13  fibromyalgia and chronic myofascial pain made movement hard, causing her to be unsteady on

14  her feet, confused, exhausted, and depressed.  (*Id.*)

15      Her psychiatrist, Dr. Hakeman, noted in her September 2004 assessment that all

16  Plaintiff's symptoms were much better than they were three years ago.  (Tr. 338.)  At the same

17  time, she diagnosed major depression in full to partial remission, anxiety, fibromyalgia, and

18  migraines, with a GAF of 60, with the highest in the past year being 60.  (*Id.*)  At that time,

19  Plaintiff continued to be treated for chronic pain by Dr. Johnston, who diagnosed her with right

20  SI joint pain and dysfunction, fibromyalgia with multiple areas of myofascial pain, and one area

21  of severe muscle spasm.  (Tr. 317, 318, 320.)  In September she reported her pain as 5/10 on

22  average, in November as 6/10 on average, and in January 2005 as 5/10 on average.  (*Id.*)

23      I find that the only clear and convincing reason given by the ALJ's conclusion that there

24  is no objective change in Plaintiff's impairments is Dr. Johnston's notation that she was much

25

26  REPORT AND RECOMMENDATION
    PAGE - 13

1  better than three years ago.  (Tr. 338.)  This single reference in view of the entire record, and the

2  term "better" is  relative does not provide sufficient specificity for discrediting the Plaintiff.

3          Second, the ALJ cites Plaintiff's travel as evidence in support of his finding that Plaintiff

4  is not credible, while according little weight to her allegations regarding an essentially invalid

5  approach to the travel (Tr. 25), which seems to imply that an invalid approach would be some

6  evidence of consistency regarding disabling pain.  The ALJ stated no reason for according little

7  weight to this allegation.  Plaintiff accompanies her husband on business trips to Europe because

8  staying home alone is harder on her.  (Tr. 99.)  She uses a wheelchair in the airport and

9  museums, and often spends the day in the hotel, rather than going out.  (Tr. 99, 236, 314, 365. )

10  On her most recent trip, she brought a friend to help her dress, bring her food, and help carry her

11  bags, and she missed all but one of the group dinners.  (Tr. 357, 358.)  I find that the ALJ has

12  failed to provide clear and convincing reasons regarding his conclusions respecting Plaintiff's

13  allegations regarding travel.

14          In addition, the ALJ cites *Anderson v. Shalala,* 51 F.3d 779, 780 (8th Cir. 1995) for the

15  rule that travel may be viewed as inconsistent with allegations of disabling pain.  In *Anderson*,

16  the Court noted that the plaintiff failed to allege disabling headaches in her application, claimed

17  to be free of back pain, failed to comply with her prescribed exercise regimen, and failed to keep

18  a number of medical appointments.  In contrast, Plaintiff's currently alleged sources of disability

19  were alleged in her application; she has not claimed to be free of pain; she has not failed to

20  comply with treatment plans, nor has she missed appointments.  Anderson's travel consisted of

21  several thousand miles in a truck, a trip that is not comparable to Plaintiff's plane trips.

22  Additionally, there were inconsistencies as to the cause of Anderson's injuries, whereas there is

23  no such inconsistency in the instant case.  Finally, unlike Plaintiff, Anderson exhibited drug-

24  seeking behavior, which the Court found further discredited her.

25

26  REPORT AND RECOMMENDATION
   PAGE - 14

1    Third, the ALJ found inconsistencies between Plaintiff's testimony and the evidence

2    regarding gallery work. (Tr. 25.) The ALJ noted that while Plaintiff testified that she had not

3    worked at the gallery since 2001, the record indicates that she had worked at the gallery on a few

4    occasions. (*Id.*) The ALJ noted that in June 2002, Plaintiff was able to stand for two hours for a

5    gallery opening; in October 2003, she was able to stand for an hour and a half at a gallery

6    opening, and was happy to be helping out; in October 2004, she was painting for an auction; and

7    in December 2004, she reported having been busy at the gallery and having sold four paintings.

8    (*Id.*)

9    Plaintiff's previous work was as a custom framer in the gallery owned by herself and her

10    husband (Tr. 69), and her duties included hosting art receptions (Tr. 118). Plaintiff stated that

11    she had become unable to do custom framing since December 2001 (Tr. 68); she also testified at

12    her hearing that she had done no gallery activity since then (Tr. 357).

13    I find that the only clear indication in the record that Plaintiff has worked in the gallery

14    since December 2001 is that she was able to help for up to one and a half hours with a show in

15    October 2003. (Tr. 244.) The record is unclear as to how she helped. It is also unclear as to

16    whether she helped for the two hours she stood in the gallery in June 2002. (Tr. 227.) Painting,

17    whether for auctions or otherwise, was not part of her past gallery work. (Tr. 69, 118.) Nor is it

18    clear from the record that the auction was connected with the gallery, nor that Plaintiff

19    participated in the auction itself, apart from her work being featured there. (Tr. 314.) It is also

20    not clear from the record whether the pieces she sold in December 2004 involved her being

21    engaged in a sales capacity at the gallery, or if she was even at the gallery when they sold. (Tr.

22    339.) Given that her husband runs the gallery, the fact that Plaintiff reported that things had been

23    busy is not clear evidence that she was a part of that business. I find that Plaintiff potentially

24    worked in some capacity approximately 3.5 hours between December 2001 and October 2004,

25

26    REPORT AND RECOMMENDATION
     PAGE - 15

1   which I find to be insubstantial and not significantly inconsistent with her claim of no gallery

2   activity since December 2001, particularly as there is nothing in the record suggesting that she

3   worked as a framer during this period.  Consequently, I do find that this is not a clear or

4   convincing reason for finding Plaintiff not credible.

5          Fourth, the ALJ found Plaintiff's ability to participate in certain activities as belying her

6   allegations of disability.  (Tr. 25.)  In support of this conclusion, he noted Plaintiff's ability to

7   travel, paint, perform in a play, and sing with choral group.  (*Id.*)  He also noted that she

8   performed a memorial service, used a torch on glass beads, and was involved in Tai Chi and

9   yoga.  (*Id.*)

10         Plaintiff reported on her Pain Questionnaire that yoga helps to relieve her pain.  (Tr.

11   102.)  She reported to Dr. Johnston that she tried, among other things, Tai Chi and yoga for

12   pain.  (Tr. 327.)  She testified at the hearing that she tried Tai Chi, but that it was a bit strenuous

13   for her.  (Tr. 361.)  As part of her pain management plan, Dr. Zeidner encouraged Plaintiff to

14   continue with stretching activities.  (Tr. 195-203, 206-211, 213, 231.)  Plaintiff reported using

15   yoga for stretching exercises.  (Tr. 220.)  Dr. Zeidner also specifically recommended that Plaintiff

16   return to yoga as part of her treatment plan.  (Tr. 147.)  Accordingly, I find that rather than

17   belying her allegations of disability, Plaintiff's yoga and Tai Chi activities support such

18   allegations, given that they were undertaken as part of her treatment plan, as prescribed by her

19   pain management physician.

20         Plaintiff reports that she paints approximately 2-3 hours per week (Tr. 99), only 1/8th the

21   amount she previously painted (Tr. 360), and often must stop painting suddenly (Tr. 102).

22   Plaintiff reported that she used a torch on September 3, 2003 to make glass beads.  (Tr. 256.)

23   She performed a memorial service in January 2004.  (Tr. 238.)  In December 2004, Plaintiff

24   reported "singing a lot" with a group.  (Tr. 339.)  She reported that she was an actor in a play in

25

26   REPORT AND RECOMMENDATION
     PAGE - 16

1   August 2002. (Tr. 269.)  She also reported "lots of pain" in connection with dress rehearsals for

2   the play (Tr. 227), and testified to an inability to show up on a regular basis (Tr. 366).  I find that

3   such activities are consistent with an attempt to lead a normal life in the face of limitation, as the

4   case law permits she need not vegetate in a dark room in order to be deemed eligible for benefits.

5        Fifth, the ALJ noted that Plaintiff consistently reports her average pain level as only 5 on

6   a scale of 1-10, and that this is a moderate level which does not necessarily prevent functioning.

7   (Tr. 26.)  The ALJ has cited no authority for his conclusion that this is a moderate level which

8   does not necessarily prevent functioning.

9        Sixth, the ALJ concluded that personality traits are at issue in this case.  (Tr. 26.)  In

10  support of this conclusion he relied on Dr. Sandvik's evaluation, noting Plaintiff's dependent and

11  histrionic traits, and that she embraces the notion of disability.  (*Id.*)  I note that the record does

12  not contain Exhibit 8F5 cited by the ALJ, and find that Plaintiff's embracement of the notion of

13  disability is not indicated at 8F4, the other citation provided by the ALJ.  I further note that the

14  ALJ's conclusion on this point is based upon Dr. Sandvik's evaluation, whereas I have found this

15  insufficient.  Whereas Dr. Sandvik diagnosed Plaintiff with dependent-histrionic personality

16  features (Tr. 173), Drs. Strong, Koch, and Hakeman did not (Tr. 143, 250, 333).  Dr. Strong

17  described Plaintiff's "style [as] one of feeling emotion strongly."  (Tr. 143.)

18        Finally, the Commissioner advances the ALJ's consideration that motivation and the issue

19  of secondary gain, arguing that it must be considered in assessing Plaintiff's credibility due to the

20  fact that her gallery has been in financial straits throughout the life of the disability application.

21  (Tr. 26.)  The record illustrates that Plaintiff applied for benefits in December 2002, and the

22  hearing occurred in June 2005; this was the life of the application at the time of the ALJ's

23  decision.  (Tr. 55, 353.)  In November 2001, Plaintiff reported that she and her husband were

24  declaring bankruptcy.  (Tr. 283.)  Dr. Strong stated that when she first started seeing Plaintiff in

25

26  REPORT AND RECOMMENDATION
    PAGE - 17

1   December 2001, she was worried about bankruptcy because she could no longer help her

2   husband in their business.  (Tr. 168.)  Two employees had to be hired to replace Plaintiff.  (Tr.

3   75.)  By the time Dr. Strong stopped seeing Plaintiff in May 2002, people had stepped forward

4   to help with business concerns.  (Tr. 168.)  Moreover in answer to the ALJ's question about

5   bankruptcy, Plaintiff testified that it had been avoided due to donations and fundraising efforts by

6   gallery artists, and that the gallery was holding its own.  (Tr. 372.)  I find that the record

7   indicates that Plaintiff's financial straits were caused by her inability to work.  I also find that the

8   record indicates that Plaintiff's financial straits had subsided by May 2002, approximately two

9   years before the hearing, and remained at bay at the time of the hearing.  Thus, I do not find

10  secondary gain to be a clear and convincing reason.

11          In summary, I find that certain reasons provided by the ALJ in support of his non-

12  credibility finding are not clear and convincing..

13  D.      RESIDUAL FUNCTIONAL CAPACITY ASSESSMENT

14          Lastly, Plaintiff argues that the ALJ failed to include all exertional and non-exertional

15  limitations in the residual functional capacity (RFC) assessment, and erred in finding she could

16  return to past work.  The ALJ must assess all the evidence to determine the claimant's capacity

17  for work despite her impairments.  20 C.F.R. §§ 404.1545(a), 416.945(a).  The ALJ must

18  evaluate the claimant's "ability to work on a sustained basis."  20 C.F.R. §§ 404.1512(a),

19  416.912(a).

20          The ALJ found that Plaintiff's fibromyalgia is a severe impairment.  The ALJ also found

21  that the nature of Plaintiff's impairments is such that her activities and credibility are critical as

22  "there is little objective medical evidence . . . [and her] treating sources have issued no opinions

23  concerning the claimant's ability to function."  Based on his non-credibility finding and his

24  assessment of the medical records, the ALJ found that Plaintiff has no nonexertional limitations

25

26  REPORT AND RECOMMENDATION
    PAGE - 18

1  of any significance, and that her past work is within her functional capacity.

2          The records from Dr. Zeidner document fibromyalgia with cervical and lumbar

3  myofascial pain, with recurrent flares occasionally noted.  (Tr. 195-232.)  Dr. Johnston's records

4  document right SI joint pain and dysfunction, multiple areas of myofascial pain, with one area of

5  severe muscle spasm in the right trapezius and cervical paraspinal muscles.  (Tr. 317-322.)  Dr.

6  Dickinson assessed Plaintiff with chronic pain (Tr. 270, 280, 291), chronic pain syndrome (Tr.

7  271), areas of muscle spasm especially in the trapezius (Tr. 283), very marked trigger points at

8  the SI joints and superiorly and laterally to those bilaterally (Tr. 291).  Treating doctors

9  documented Plaintiff's slow and/or antalgic gait and cane usage on numerous occasions.  (Tr.

10  195, 197-203, 206-207, 209-211, 213-214, 317-18, 330.)  Dr. Dickinson, Plaintiff's primary care

11  physician for four years, noted in her January 2002 treatment plan that she would support

12  Plaintiff's claim for disability based on fibromyalgia.  (Tr. 280.)  Dr. Koch diagnosed her as

13  unable to work due to fibromyalgia, with a GAF of 55.  (Tr. 247.)  Dr. Strong assessed

14  Plaintiff's GAF as between 51 and 60.  (Tr. 143.)  Dr. Hakeman assessed her GAF as 60.  (Tr.

15  338.)

16          Accordingly, I find that the record contains opinions from Plaintiff's treating sources

17  concerning her functional limitations which contravene the ALJ's analysis.  Plaintiff's doctors

18  have consistently diagnosed her as suffering from chronic pain, and assessed her functioning as

19  between 51-60.  One specifically opined that she is "unable to work" due to fibromyalgia, and

20  another stated that she would support Plaintiff's claim for disability based on fibromyalgia, thus

21  implying an inability to work.  In addition, Plaintiff herself supplied details regarding her physical

22  limitations in her application documentation and testimony.

23          Furthermore, the nature of the impairment, i.e., chronic pain due to fibromyalgia, is of

24  importance in this case.  According to Plaintiff, her disability is based on an inability to work on a

25

26  REPORT AND RECOMMENDATION
    PAGE - 19

sustained basis due to pain, which either prevents her from working, or is exacerbated by

working.  The record sets forth several reasons: a) in her Disability Report that she reduced her

work hours initially due to pain, and that the severity of the pain made her unable to predict

when she could come into work, making her an unreliable employee  (Tr. 68);  b) in her

Activities of Daily Living and Socialization report, she stated that the time she spent on activities

varied depending on the severity of her pain (Tr. 82), that she could no longer commit to being

somewhere at a regular time, and that there are days she cannot get out of bed (Tr. 83.)  c) in the

Daily Activities Questionnaire - Other Person, a friend reported that Plaintiff has significant pain

on any given day, and that her attention span depends on her discomfort level.  (Tr. 91);  d) in

her Pain Questionnaire, Plaintiff reported that her pain is constant but the severity fluctuates, and

that stress, overactivity, standing too long, and over-concentration exacerbate it  (Tr. 10); e) In a

letter to the Social Security Administration, Plaintiff stated that chronic pain makes her life

unpredictable, and that she does not know whether she will be bedridden on any given day, or

able to drive or walk.  (Tr. 107.)[2]

     I find that because the ALJ failed to fully consider evidence from the treating sources and

from Plaintiff herself regarding the degree of her pain, he consequently failed to fully take into

---

[2]  Plaintiff  reported to Dr. Zeidner that her pain was exacerbated by standing and physical
activity. (Tr. 144.)  She opined that a pain treatment had not been effective due to her activity
level following the treatment.  (Tr. 230.)  She reported to Dr. Koch that fibromyalgia prevented
regular attendance at work, and that she could not dependably make appointments with
customers.  (Tr. 243-44.)  She reported to Dr. Johnston that she takes several rests during the day
in an attempt to alleviate the pain.  (Tr. 326-27.)  She testified that she has approximately two
normal days per week and three to four good days a month.  (Tr. 359.)  When she began reducing
her work hours, she found that working three hours on one day would require two days to
recuperate.  (Tr. 362.)  She testified that she was no longer working due to her inability to
maintain a regular schedule as a result of the unpredictability of the pain.  (Tr. 362.)  Finally, she
testified that her pain has gotten better since discontinuing work.  (Tr. 371.)

REPORT AND RECOMMENDATION
PAGE - 20

1 | consideration Plaintiff's exertional and non-exertional limitations in reaching his conclusions

2 | regarding her RFC and ability to return to past relevant work.

3 | VIII.  CONCLUSION

4 |     The Commissioner's determination to deny Plaintiff Disability Insurance Benefits is not

5 | supported by substantial evidence in the record as a whole nor free of legal error.  Based on the

6 | record evidence, the undersigned recommends that the Commissioner's decision be REVERSED

7 | and REMANDED for further proceedings.

8 |     DATED this 3rd day of January, 2007.

9

10

11 | MONICA J. BENTON

12 | United States Magistrate Judge

13

14

15

16

17

18

19

20

21

22

23

24

25

26 | REPORT AND RECOMMENDATION
PAGE - 21